Filed 4/19/21  P. v. Moreno CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAUL DIAZ MORENO,<br><br>Defendant and Appellant. | F078495<br><br>(Super. Ct. No. 16CR-07163)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.  (Retired Judge of the Merced Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Raul Diaz Moreno sexually abused his adopted daughters, S.M. and B.M., over the course of many years. Eventually, S.M. moved out. When S.M. was 19 years old and B.M. was 17 years old, B.M. sent S.M. a message reporting that she was being sexually abused by defendant. S.M. went with her boyfriend, her newborn daughter, and two companions to retrieve B.M. from the family home. Eventually, B.M. exited the residence, followed by defendant. As S.M., B.M., and their companions walked toward their vehicles, defendant shot S.M. in the back of the head; shot S.M.'s boyfriend in the ribs, shoulder, and back; and shot B.M. in the leg. Defendant pointed the gun at S.M.'s other two companions and pulled the trigger, but the gun failed to fire. When law enforcement arrived, defendant fired an additional two to three shots from inside the residence. Defendant surrendered to law enforcement a few hours later. All victims survived the shooting.

A jury convicted defendant on three counts of attempted murder (Pen. Code §§ 187, subd. (a), 664, subd. (a);[1] counts 1-3); five counts of assault with a firearm (§ 245, subd. (a)(2); counts 4-8); two counts of assault with a firearm upon a peace officer (§ 245, subd. (d)(1); counts 9-10); continuous sexual abuse of S.M. (§ 288.5, subd. (a); count 11); attempted forcible rape of S.M. (§§ 261, subd. (a)(2), 664; count 12); continuous sexual abuse of B.M. (§ 288.5, subd. (a); count 13); and forcible lewd acts upon a child as to B.M. (§ 288, subd. (b)(1); count 14). As to counts 1 through 3, the jury found defendant had personally and intentionally discharged a firearm and caused great bodily injury. (§ 12022.53, subd. (d).) As to counts 4 through 6, the jury found defendant had personally used a firearm (§ 12022.5, subd. (a)), and had personally inflicted great bodily injury (§ 12022.7, subd. (a)). As to counts 7 and 8, the jury found defendant had personally used a firearm. (§ 12022.5. subds. (a), (d).) As to

---

[1] Undesignated statutory references are to the Penal Code.

counts 11, 13, and 14, the jury found defendant had committed an offense specified in section 667.61, subdivision (c) against more than one victim.  (§ 667.61, subds. (b), (e).)

The court sentenced defendant to an aggregate term of 120 years to life plus 29 years, as follows:  consecutive terms of two years, four months on each of counts 1 through 3, plus terms of 25 years to life for each of the firearm enhancements; a consecutive term of four years on count 7, plus 10 years for the firearm enhancement; a consecutive term of one year on count 8, plus one year, four months for the firearm enhancement; consecutive terms of two years on each of counts 9 and 10; a consecutive term of one year, eight months on count 12; and consecutive terms of 15 years to life on each of counts 11, 13, and 14.  Sentence on counts 4 through 6 was imposed and stayed pursuant to section 654.  The court also ordered defendant to pay a $10,000 restitution fine, a $560 court operations assessment, a $420 conviction assessment fee, and $22,785.55 in victim restitution.

On appeal, defendant contends his conviction on count 14 must be reversed due to improper communication between the court and jury that violated his constitutional rights, and because the court's response to a jury question was erroneous.  Defendant additionally contends the fines, fees, and assessments imposed by the trial court violate his federal and state constitutional rights because he is unable to pay.  Lastly, defendant contends the abstract of judgment must be corrected in several respects.

We conclude the court's communication with the jury did not violate defendant's constitutional rights and, in any event, was harmless beyond a reasonable doubt.  We also conclude defendant has failed to demonstrate prejudice arising from the court's challenged response to the jury's question.  We additionally conclude defendant has forfeited his challenge to the fines, fees, and assessments imposed by the trial court and, in any event, his arguments are without merit.  We agree that the abstract of judgment requires correction as explained below, and will remand for the court to make these corrections.  In all other respects, we affirm.

3.

# FACTS

As the issues on appeal are not fact-dependent, we summarize the factual background only briefly.

Defendant and his wife Margaret M.[2] adopted S.M. and B.M., who are biological sisters, when the girls were young. The couple also have five older biological sons[3] and a biological daughter the same age as S.M. The children primarily grew up in Los Banos, but the family moved to Merced in 2013 when defendant became a pastor. S.M. moved out of the family home in 2015.

## I. THE PEOPLE'S CASE

S.M. testified that defendant began sexually abusing her when she was in the third grade. Defendant would require S.M. to massage his penis or orally copulate him. The sexual abuse continued for several years. On Valentine's Day of 2015, defendant pinned S.M. to the couch and said, "This is what you want. This is what every guy is going to do to you anyway," and attempted to rape her. On February 17, 2015, S.M. reported the abuse to Margaret, who admitted she was aware of it. That day, S.M. also moved out of the family home. S.M. reported the sexual abuse to Child Protective Services in 2015, after she moved out.

B.M. was 18 years old at the time of trial. She testified that defendant began sexually abusing her when she was in kindergarten. Eventually, defendant would make B.M. orally copulate him approximately once per week. He would also come into B.M.'s room in the night to have sex with her or sodomize her. He would also fondle her breasts in the morning when she was required to bring him coffee. This abuse continued for several years. On the evening of Easter Sunday when B.M. was in seventh grade,

---

**2** Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

**3** The oldest son was raised by defendant but is Margaret's son from a prior relationship.

defendant raped her. A few months before B.M. turned 17, she reported the abuse to her oldest brother, who then told Margaret.

B.M. acknowledged that she met with Child Protective Services workers in 2015 after S.M. moved out and told them no one in the household had touched her sexually. She testified that she had denied the abuse because she did not want to "tear up a family and a church."

On October 28, 2016, B.M., who was then 17 years old, contacted S.M., who was then 19 years old, through Facebook Messenger. B.M. told S.M., "What Dad did to you, he's doing to me now." S.M. told B.M. to pack her belongings because S.M. was going to pick her up. S.M. then went to the family home in Merced with her boyfriend Josh M.[4] and their newborn daughter. Josh's brother Felix G., and Felix's girlfriend, Chanel B., followed in a separate vehicle.

Upon arrival at the residence, S.M. called the police to report that defendant had been raping her sister. S.M., Josh, and Felix approached the residence. Chanel stayed in S.M. and Josh's car to look after the infant. S.M. knocked on the door while Josh and Felix remained on the sidewalk. B.M. answered, and S.M. told B.M. to gather her belongings. B.M. went upstairs and told defendant and Margaret that she was leaving because she was no longer willing to endure physical and sexual abuse. Defendant told B.M., "If you say anything, I will . . . kill you guys." Margaret told B.M. to take all her property because they did not want her there anymore. S.M. opened the door and asked if they were beating B.M.

Defendant came out and asked S.M. why they were there. S.M. told defendant, "What you've been doing to me, you started doing to her." Defendant's facial expression changed and he went back inside and locked the door. B.M. eventually came out the

---

**4**    Josh's real name is Josue. However, he was referred to throughout trial as Josh.

front door. Felix took B.M.'s bag and said they should leave. Chanel exited the car and approached B.M. to try to comfort her.

As B.M., S.M., Josh, Felix, and Chanel walked toward their cars, defendant began following them and frantically and repeatedly told S.M. he wanted to speak with her. S.M. declined and continued walking away. Defendant took a gun from his pocket and shot S.M. in the back of the head, causing her to fall to the ground. Josh attempted to pick her up, and defendant fired the gun three times in Josh and S.M.'s direction, striking Josh in the ribs, right shoulder, and back. Defendant turned to B.M. and shot her in the leg, causing her to fall to the ground. Defendant pointed the gun at Chanel and Felix and pulled the trigger, but the gun only made a clicking noise and did not fire.

Margaret came outside and screamed, "He shot the girls. He shot the girls." Defendant walked casually back toward the house. As he did so, a neighbor came out and asked what had happened. Defendant looked the neighbor in the eye and said, "They wouldn't fucking listen," then went inside the house.

Felix carried S.M. and Josh to Josh's car and drove them and their infant to the hospital. Chanel, who was a registered nurse, stayed behind and rendered aid to B.M. All three shooting victims survived. Josh suffered a collapsed lung and was hospitalized for several days. S.M. lost hearing in her left ear and continued to suffer headaches and anxiety related to the shooting at the time of trial. B.M. spent a month in the hospital, had to use a walker for several months thereafter, and continued to experience leg pain at the time of trial.

Numerous police officers and Special Weapons and Tactics (SWAT) team members responded to the scene. While the officers were positioned outside defendant's home, two to three additional shots rang out, which officers believed may have been fired from the window of defendant's home. The SWAT team eventually surrounded the residence, and defendant surrendered after approximately two to three hours.

6.

Officers located two bullet strikes on a responding detective's car and a bullet fragment inside the trunk of his vehicle. There was also a bullet strike in a nearby home.

## II.   DEFENSE CASE

S.M. and B.M. were called as witnesses in the defense case. S.M. testified regarding prior reports she had made to other people of sexual abuse by defendant and three of her brothers. B.M. testified that two of her brothers touched her sexually, but admitted she had not previously reported that conduct. B.M. denied ever seeing abuse of S.M. by the brothers S.M. had accused.

All five of defendant's sons and defendant's biological daughter testified for the defense. The sons who were accused of sexual abuse by S.M. and/or B.M. denied the accusations. The sibling witnesses also denied seeing defendant sexually abuse B.M. or S.M., denied seeing any of the conduct S.M. or B.M. described surrounding the abuse, and/or generally denied that S.M. or B.M. reported any abuse to them.[5] Defendant's daughter-in-law, who lived with the family for a time, similarly testified that she did not see defendant or her husband have inappropriate interactions with S.M. or B.M. and that neither S.M. nor B.M. reported any abuse to her.

Margaret testified that defendant previously was arrested for domestic violence after an argument in which the couple struggled over her purse. She denied he physically abused her or the children. She also testified that S.M. and B.M. did not report any sexual abuse to her while they lived in Los Banos. Margaret testified that S.M. was angry about moving to Merced and did not want to be a "pastor's kid." Margaret denied seeing her sons or defendant touch S.M. or B.M. sexually.

---

[5]   One of the brothers testified that B.M. reported to him in 2015 that she wanted to leave home because she was being raped. He told his mother about this allegation. He also was made aware that S.M. had made allegations of rape against several family members, but he testified that she recanted those allegations in 2016.

7.

Margaret testified that, on the day S.M. moved out of the family home, S.M. told Margaret that she was tired of being raped by defendant and her brothers. According to Margaret, B.M. later said that S.M. was lying in order to hurt Margaret. In July 2016, B.M. told one of her brothers that defendant was sexually abusing her. The brother relayed this accusation to Margaret, who confronted B.M. Margaret took B.M. to face defendant and tell him of the accusation. B.M. "fumbl[ed] over her words" but admitted telling one of her brothers that defendant had raped her. Margaret sent B.M. to her room. Later that night, B.M. stated the accusation was a lie and apologized.

## DISCUSSION

### I. COURT COMMUNICATIONS WITH THE JURY

Defendant contends his conviction on count 14 must be reversed because the trial judge had improper communications with the jury that denied defendant his constitutional rights to be present with counsel, to assistance of counsel, and to a trial by an impartial jury. We conclude the court's communication with the jury did not violate defendant's constitutional rights and, regardless, any error was harmless beyond a reasonable doubt.

### A. Additional Factual Background

Defendant challenges the court's response to jury questions that primarily concerned counts 11 through 14. Count 11 alleged continuous sexual abuse of S.M. on or between November 13, 2006, and November 12, 2010. Count 12 alleged attempted forcible rape of S.M. on or about February 14, 2015. The prosecutor expressly linked this count to S.M.'s testimony that defendant had attempted to rape her on Valentine's Day in 2015. Count 13 alleged continuous sexual abuse of B.M. on or between August 7, 2005, and April 6, 2012. Count 14 alleged a forcible lewd act upon B.M. on or about April 8, 2012. The prosecutor expressly linked this count to B.M.'s testimony that defendant raped her in Merced on Easter when she was in the seventh grade.

8.

Jury deliberations commenced at 1:46 p.m. on May 30, 2018. At 2:44 p.m., the jury submitted "Jury Question or Request No. 1" (some capitalization omitted), which requested a readback of Chanel's testimony. The court minutes reflect that the parties were contacted telephonically and agreed with the court's proposal to have the court reporter commence the requested readback in the jury deliberation room. The readback was conducted by the court reporter in the jury deliberation room that same afternoon. Deliberations later ceased for the day, to be continued the following morning.

Deliberations recommenced on May 31, 2018, at 10:05 a.m. At 12:02 p.m., the jury submitted "Jury Question or Request No. 2" (some capitalization omitted), which requested a readback of B.M.'s "Easter Testimony," and S.M.'s "Valentines [*sic*] Testimony." The court minutes reflect that the parties agreed with the court's proposal to have the court reporter commence the requested readback in the jury deliberation room. However, before the court reporter did so, the jury submitted "Jury Question or Request No. 3" (some capitalization omitted) at 12:45 p.m., requesting clarification regarding the multiple victim enhancement to counts 11, 13, and 14. The court minutes reflect that the clerk contacted counsel telephonically and that counsel agreed with the court's proposed response to Jury Question or Request No. 3.

At 1:10 p.m., the court reporter commenced the readback of testimony requested in Jury Question or Request No. 2. The readback concluded at 1:44 p.m. At 1:45 p.m., the court and court reporter convened with the jury on the record in the jury room to provide the court's response to Jury Question or Request No. 3. After the court concluded the response to Jury Question or Request No. 3, the following exchange occurred:

> "THE JUROR: Oh. Okay. That's all we needed. Perfect. Thank you so much.
>
> "THE JUROR: Thank you.
>
> "THE JUROR: Thank you.

"THE JUROR:  The only thing is we need the year of the Easter --

"THE JUROR:  The Easter -- oh, yeah.

"THE JUROR:  The Easter year.

"THE JUROR:  There's some confusion.

"We got a correction this morning on Count Fourteen, the year that the Easter -- [6]

"THE JUROR:  The 2012.

"THE JUROR:  -- allegation occurred.

"THE COURT:  Yes.

"THE JUROR:  And it went from 2017, which was a typo, to 2012.

"THE COURT:  Yes.

"THE JUROR:  But now that's inconsistent with the testimony that the reporter just read back that they were already in Merced.  So we just want to double-check the year.

"THE COURT:  Double-check the year?

"THE JUROR:  For the --

"THE JUROR:  Was it 2012 or 2013?

"THE JUROR:  For Easter.

"THE JUROR:  Because we're all under the impression from testimony from --

"THE COURT:  Okay.  I'll --

"THE JUROR:  -- 2000 --

"THE JUROR:  There's another typo right here.  (Indicating.)

"THE COURT:  Okay.  Just save that.

---

**6**    The record does not reflect this correction or when it occurred.

"THE JUROR:   Okay.

"THE COURT:  I know where you -- it's the year, was it 2012 or 2013.

"THE JUROR:  Well, it's on a different count, though, for -- this is a different count.

"THE COURT:  It's Count Fourteen; right?

"THE JUROR:  This is regarding Count Fourteen.  But there's also a typo on Count Twelve.

"THE JUROR:  A different typo?

"THE JUROR:  Yeah.  Right here.  (Indicating.)

"THE COURT:  Oh.  Yes.  Right.  That --

"THE JUROR:  That's what I -- I mean, the other one's the same way.

"THE COURT:  Yes.  Right.  Yes.

"Okay.  Thank you."

The court minutes reflect that the court's response to Jury Question or Request No. 3 concluded at 1:48 p.m.  It is unclear from the court minutes whether the above discussion occurred immediately before or after that time.

At 1:53 p.m., the jury submitted "Jury Question or Request No. 4" (some capitalization omitted), which appears to memorialize the jurors' concerns that were expressed to the court:

"Clarification on specific date (year) for charge verdict count 14. States April 8 2012.  Victim alleged that event occurred in Merced and they didn't move to Merced in 2013.

11.

"—clarify exact year for verdict count 12 'Attempted Forcible rape on or about February 14, 20115' (unclear)[.]"[7]

The court minutes reflect that the court received Jury Question or Request No. 4 at 1:54 p.m. On the record, the court contacted counsel telephonically and read them the jury's request:

> "THE COURT: Okay. The jury just sent out another question. The question is:
>
> " 'Clarification on specific year. For charge Count Fourteen, it states April 8th, 2012. Victim alleged that event occurred in Merced, and they didn't move to Merced in 2013.'
>
> "I think it should read they didn't move to Merced 'until' 2013.
>
> "[PROSECUTOR]: Okay.
>
> "THE COURT: So --
>
> "[DEFENSE COUNSEL]: Right.
>
> "THE COURT: And the Information alleges 2012."

The prosecutor proposed reading the jury the "instruction on 'on or about.' "[8] The court stated,

> "Now if they -- if they believe that the crime was committed, the Information can always be amended to conform to proof. But this opens up a very complicated issue. But it still -- if they believe -- if they believe beyond a reasonable doubt that the crime alleged in Count Twelve [sic] occurred, I could tell them to insert the date that they believe is -- that they're basing their decision on."

---

**7** To the extent possible, we have attempted to reproduce the form of the handwritten jury question. In the handwritten note, the numbers "0115" were circled, and an arrow pointed to these numbers as being "(unclear)[.]"

**8** It appears the prosecutor was referring to CALCRIM No. 207, which informs a jury that the People are not required to prove that a crime took place exactly on the date alleged, but only that it happened reasonably close to that day. Here, the jury was not instructed with CALCRIM No. 207.

12.

The court continued,

> "The key -- the key thing is whether they find beyond a reasonable doubt that the act alleged in Count Twelve occurred.
>
> "If they believe the date is wrong, I'm going to tell them to write in the correct date on the verdict form, write in the date, and then we can deal with it afterwards on motions. But at least I'll have a factual finding."

Defense counsel objected to this proposed course.[9] With regard to the jury's question regarding count 12, the parties agreed that the verdict form contained a typographical error and that the form should be corrected to read February 14, 2015. Counsel did not express during this discussion any desire for herself or her client to be present when the court gave the proposed responses to the jury.

At 2:05 p.m., the court and court reporter convened with the jury on the record in the jury deliberation room and the following discussion occurred:

> "THE COURT: Okay. With respect to your question about clarification on the specific date for a charge on Count Fourteen. It states April 8th, 2012, but the victim alleges that the event occurred in Merced, and they didn't move to Merced -- I assume this was -- should have been 'until' --
>
> "THE JUROR: Yes.
>
> "THE COURT: -- 2013. Okay.
>
> "The answer I am going to give you is that if you find beyond a reasonable doubt that the act alleged in Count Fourteen occurred on or about April 8th, that you find beyond a reasonable doubt that it occurred on or about April 8th, but you believe the year is wrong, put in the year on the verdict form that your finding is based upon. In other words, your finding still has to be beyond a reasonable doubt that the acts alleged in Count Fourteen occurred, but you think the date -- the year is different.
>
> "THE JURORS: (Nod head.)

---

**9** However, the court minutes reflect that counsel agreed with the court's proposed response as stated on the record. Regardless, defendant's appeal does not challenge the substance of the court's response.

"THE COURT:  Put in the year you think it happened on the verdict form.

"THE JUROR:  Okay.

"THE COURT:  Just put in the year.

"If you find that -- if you're not convinced beyond a reasonable doubt that it occurred, then, of course, your obligation is to vote not guilty; okay?

"THE JUROR:  Okay.

"THE JUROR:  Thank you.

"THE COURT:  Then on your next question on Count Twelve, the date, that's a typo.

"THE JUROR:  Okay.

"THE COURT:  It's a typo.  Just --

"THE JUROR:  It's 2015.

"THE COURT:  It's 2015.

"THE JUROR:  Okay.

"THE COURT:  That's just a typographical error.

"THE JUROR:  Thank you.

"THE JUROR:  Thank you, Your Honor."

The court's response to the jury concluded at 2:06 p.m.  At 2:43 p.m., the court received "Jury Question or Request No. 5" (some capitalization omitted), which requested a readback of B.M.'s "Easter Testimony."  The court minutes reflect that the clerk contacted counsel telephonically and counsel agreed to a readback of the requested testimony by the court reporter in the jury deliberation room.  The readback was conducted by the court reporter in the deliberation room shortly thereafter.

At 2:59 p.m., the jury submitted "Jury Question or Request No. 6" (some capitalization omitted), which stated, "What happens when we are hung on a verdict?

14.

(one count)[.]"  The clerk contacted counsel telephonically and advised them to appear in the courtroom.  With all parties present, the jury confirmed that they had reached a decision on 13 counts, but were unable to reach a decision on one, unidentified count. The jurors reported that they were originally split "9 to 3" on this count, but were then split "10 to 2."  When the court asked whether further deliberations would assist them in reaching a resolution, some jurors indicated affirmatively, while others said, "No." Outside the presence of the jury, the following discussion occurred:

> "THE COURT:  I could send them home -- it's 3:30 -- and give them a short opportunity in the morning to try to reach a verdict on the one count.  That's my inclination.  But if they've reached a verdict on 13 counts, frankly, it may not make much difference.  But it could.  We never know.
>
> "[DEFENSE COUNSEL]:  Your Honor, to that -- because we don't know which way it's going --
>
> "THE COURT:  Correct.
>
> "[DEFENSE COUNSEL]: -- and they've indicated 13 out of 14 counts, my inclination would be to go forward.  However, again, we don't know which way it's going.
>
> "I would say give them until tomorrow and see if we can get a resolution to everything.
>
> "THE COURT:  That's my first inclination.
>
> "[DEFENSE COUNSEL]:  And I -- I -- I concur in that.
>
> "THE COURT:  The People don't have any response?
>
> "[PROSECUTOR 1]:  Well, am I -- we might take action, depending on which count it is, to resolve that now.
>
> "[PROSECUTOR 2]:  I mean, if they're hung on one count, we will dismiss that count.
>
> "[PROSECUTOR 1]:  Well, depending on which count it is.
>
> "[PROSECUTOR 2]:  Yes.

15.

"THE COURT: You don't know which way the vote is, though.

"[PROSECUTOR 2]: Yes.

"THE COURT: It could be not guilty on --

"[PROSECUTOR 1]: The 13.

"THE COURT: -- 13 counts and hung on one. If that's the case, you probably will decide what to do anyway; right?

"[PROSECUTOR 2]: Yeah. Yeah.

"I'll submit to the Court. If you want to wait for another day -- it sounds like they're hung on that count, but --

"THE COURT: Well, they're a very conscientious group, and they have been pretty accommodating to our schedules.

"[DEFENSE COUNSEL]: They have.

"THE COURT: I'd like to be somewhat reciprocal to them. Because once it gets to a point of being hung, you can just see the stresses start to develop in their faces.

"[DEFENSE COUNSEL]: Your Honor, I would -- I would posit to suggest to the jury to go for tonight. When they come back in the morning, take a new count. If they're still hung, we'll go forward with that, with the hung count. But give them time to review what they've discussed and get a good night's sleep and then take another count tomorrow. It might go back to 9 to 3. It might become 8 to 4. It might be still, you know, 10 to 2.

"THE COURT: Yes.

"[DEFENSE COUNSEL]: But give them that time. Because it has been a very stressful process. And if they've got the one count -- give them a night.

"THE COURT: Yes. Okay."

Thereafter, the jury was recessed for the remainder of the day.

Deliberations recommenced the following morning at 10:06 a.m. At 11:15 a.m., the jury submitted "Jury Question or Request No. 7" (some capitalization omitted), which stated:

16.

"Can you please clarify count 14 as it relates to date.

"~~When it states 'on or about April 8th~~'

"Can we vote ~~giulty~~ guilty on count 14 if we conclude that a forcible lewd act occurred at any time before she turned 14?" (Stricken text in original.)

At 11:23 a.m., the court convened with the parties, outside the presence of the jury. The court and the prosecutor both agreed that the jury's question should be answered, "Yes." Defense counsel stated, "If it's 'on or about,' then I believe we don't have a choice on that one." The court agreed and stated, "I'm going to go in the jury room and tell them the answer." Immediately thereafter, the court and court reporter convened in the deliberation room and so informed the jury.

At approximately 1:15 p.m., the jury reported that it had reached a verdict. As indicated, the jury found defendant guilty on all counts, including count 14. On the verdict form for count 14, the jury corrected the date of the offense from "on or about April 8, 2012" to "on or about April 8, 2013."

## B.    Applicable Law

"A criminal defendant has a constitutional right to counsel at all critical stages of a criminal prosecution . . . ." (*People v. Doolin* (2009) 45 Cal.4th 390, 453; accord, *United States v. Cronic* (1984) 466 U.S. 648, 659.) A "critical stage" of a criminal prosecution is one which has "significant consequences for the accused." (*Bell v. Cone* (2002) 535 U.S. 685, 696.) In general, communication to the jury during deliberations carries significant consequences. (*Musladin v. Lamarque* (9th Cir. 2009) 555 F.3d 830, 840-841 (*Musladin*); accord, *People v. Hawthorne* (1992) 4 Cal.4th 43, 69 (*Hawthorne*) [communication between a judge and jury during deliberations without affording defendant and counsel an opportunity to be present impinges on a defendant's constitutional right to the assistance of counsel].) However, it is the formulation of the response to a jury's question or request, rather than the delivery of that response, that constitutes a critical stage of criminal proceedings. (*Musladin*, at p. 842.) Thus, the trial

court must notify defendant or defense counsel and afford an opportunity for objection before responding to a jury question or request. (*Ibid.*; *People v. Lozano* (1987) 192 Cal.App.3d 618, 623 (*Lozano*).)

Our Supreme Court has similarly noted that instructing the jury without affording defendant and defense counsel an opportunity to be present may impinge on the defendant's constitutional rights to assistance of counsel and to personal presence at all trial proceedings.[10] (*Hawthorne*, *supra*, 4 Cal.4th at p. 69.) Courts of Appeal have regularly found a violation of these rights where the court engages in private communications with the jury without notice to defendant or his counsel, and without the presence of the court reporter. (E.g., *People v. Bradford* (2007) 154 Cal.App.4th 1390, 1413-1414 (*Bradford*) [finding a violation of right to assistance of counsel where judge had four unreported interactions with the deliberating jury, during which the jury posed questions and the judge responded]; *People v. Knighten* (1980) 105 Cal.App.3d 128, 132 [holding that private communications between judge and deliberating jury were improper, where court entered jury deliberation room without notice to or presence of defendant, defense counsel or the court reporter, to clarify a jury request for readback of testimony].)

### C. Analysis

Defendant argues that the court improperly communicated with the jury because "[t]he record does not show the court ever informed the parties, or [defendant] specifically, that it intended to accompany the court reporter in the jury room during

---

[10] Additionally, a defendant and defense counsel have the statutory right to be present during the court's response to a jury question. (*Hawthorne*, *supra*, 4 Cal.4th at p. 69; see § 1138.) Section 1138 requires that if the jury "desire[s] to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (*Ibid.*)

readbacks or that it intended to personally respond to the jury's questions in the jury room, or that it actually had done so." According to defendant, he was prejudiced by this conduct because he was unaware that the jurors expressed concern regarding the date of the offense alleged in count 14. Defendant asserts that, had he been aware of the jury's concern regarding the date of the offense, the parties may have agreed to dismiss count 14 when the jury announced it was struggling to reach a verdict on one of the counts.

We first reject defendant's suggestion that the trial judge violated defendant's constitutional rights by accompanying the court reporter in the jury room during readbacks of testimony. The jury requested a readback of testimony on three occasions: (1) Chanel's testimony, (2) B.M.'s "Easter Testimony" and S.M.'s "Valentines [*sic*] Testimony," and (3) a second readback of B.M.'s "Easter Testimony." On each occasion, the parties were contacted telephonically and agreed to the court's proposal to have the court reporter conduct the readback in the jury deliberation room. Nothing in the court minutes or the reporter's transcript supports defendant's assertion that the trial judge accompanied the court reporter during a readback of testimony. Defendant's argument is factually unsupported. He has failed to establish that the court's conduct in this regard violated his constitutional rights.

Defendant next argues that the court violated his right to the assistance of counsel at a critical stage of the proceedings by personally responding to the jury's questions in the jury deliberation room. The court responded to three requests in the jury deliberation room: (1) Jury Question or Request No. 3 requesting clarification regarding the multiple victim enhancement to counts 11, 13, and 14; (2) Jury Question or Request No. 4 requesting clarification regarding the dates of the offenses alleged in counts 12 and 14;

19.

and (3) Jury Question or Request No. 7 requesting further clarification as to the date of the offense alleged in count 14.[11]

Defendant had a constitutional right to the assistance of counsel in formulating a response to these requests (*Musladin*, *supra*, 555 F.3d at p. 842; *Lozano*, *supra*, 192 Cal.App.3d at p. 623), and counsel was afforded such an opportunity. As to the jury's request for clarification regarding the enhancement to counts 11, 13, and 14, counsel was contacted telephonically and agreed to the court's proposed response. As to the jury's request for clarification regarding the date of the offenses alleged in counts 12 and 14, a telephonic conference was held and defense counsel objected in part to the court's proposed response. As to the jury's request for further clarification regarding the date of the offense alleged in count 14, counsel and defendant personally appeared in the courtroom and defense counsel agreed with the court's proposed response. The court did not violate defendant's right to the assistance of counsel at these critical stages of the prosecution. (*Musladin*, at p. 842; *Lozano*, at p. 623; accord, *Hawthorne*, *supra*, 4 Cal.4th at pp. 68-69.)

Defendant also suggests the court's communication with the jury compromised the privacy of jury deliberations and thereby violated his right to trial by an impartial jury.[12]

---

[11] The jury also submitted a question regarding what would happen if they were hung on a count. As stated above, the court convened with the parties in open court, and all agreed to recess the jury for the day and to allow deliberations to continue the following day. The jury was so advised in open court, in the presence of all parties. Defendant does not contend the court violated his constitutional rights in response to this question.

[12] Defendant did not present a developed argument on this point until his reply brief. The argument is therefore untimely. (*Donorovich-Odonnell v. Harris* (2015) 241 Cal.App.4th 1118, 1141; *In re Luke H.* (2013) 221 Cal.App.4th 1082, 1090.) Additionally, to the extent defendant challenges the court's response to Jury Question or Request No. 7, his argument is unpersuasive, inasmuch as the court informed the parties in open court, "I'm going to go in the jury room and tell them the answer." Defense counsel neither objected to that proposed course nor expressed a desire to be present.

20.

Generally, " '[a] trial court should not entertain, let alone initiate, communications with individual jurors except in open court, with prior notification to counsel.' " (*People v. Clark* (2011) 52 Cal.4th 856, 987.) "The prohibition against ex parte communications is designed to ensure that the defendant has ' "an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection . . . ." ' " (*Ibid*.) Here, as stated, counsel had prior notice and an opportunity to object to the court's proposed communication.

Nonetheless, we acknowledge that the judge's presence in the jury room in response to Jury Question or Request No. 3 exposed the judge to additional jury questions regarding the dates of the offenses alleged in counts 12 and 14. However, the judge did not respond to the jurors' questions, instruct the jury beyond what had been discussed with counsel, or engage in conversation that would have offered unintended or misleading impressions of the judge's views or of the law. Instead, the judge terminated the conversation, the jury reduced their questions to writing, and the written questions were immediately conveyed to the parties during a telephonic conference. (See *People v. Delgado* (1993) 5 Cal.4th 312, 331 ["In this case, the trial judge should have declined to answer the juror's question, immediately terminated all discussion, and reminded the jury that any questions of law on which they desired guidance must be in writing."].) Additionally, although not conducted in open court, the judge's communication with the jury was reported by the court reporter. These factors distinguish the instant case from other cases wherein a judge's private communication with a jury or jurors has been determined to be reversible error. (E.g., *United States v. United States Gypsum Co.* (1978) 438 U.S. 422, 460-462 [finding reversible error where trial judge engaged in unrecorded conversation with jury foreman and impressed upon the foreman that he wanted a verdict " 'one way or the other' "]; *Bradford*, *supra*, 154 Cal.App.4th at pp. 1413-1414, 1420-1421 [finding reversible error where judge entered deliberation room unsolicited while jury deliberated, offered further instruction, responded to jury

21.

questions, observed jurors altering notes summarizing their understanding of the applicable law, and drew conclusions regarding the jury's views].)

Defendant also appears to contend the court's response to these questions in the jury deliberation room violated his right to be personally present with counsel at all trial proceedings. The right to personal presence at all critical stages of the trial is a fundamental right of each criminal defendant. (*Rushen v. Spain* (1983) 464 U.S. 114, 117 (*Rushen*).) The record does not disclose that defendant personally waived that right. However, even if we assume the court violated defendant's right to be personally present by responding to jury questions in the jury deliberation room after notice to counsel and an opportunity to object, defendant cannot establish prejudice.

To the extent the court's conduct violated defendant's constitutional rights, we consider whether the alleged constitutional error was harmless beyond a reasonable doubt under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 20-21. (*Rushen*, *supra*, 464 U.S. at p. 120; *People v. Clark*, *supra*, 52 Cal.4th at pp. 987-988.) Here, defendant's only claim of prejudice is that, had he known the jury was confused regarding the date of the offense alleged in count 14, the parties may have agreed to dismiss that count when the jury submitted Jury Question or Request No. 6, asking, "What happens when we are hung on a verdict?" However, defendant *did* know of the jury's confusion, given that the jury's concerns had been memorialized in Jury Question or Request No. 4 earlier in the afternoon. Defense counsel nonetheless did not ask the court to dismiss the disputed count, as the People suggested, but rather asked that the jury be permitted to continue deliberating.

Defendant does not offer any other argument suggesting how his or his attorney's presence during the court's communications with the jury would have impacted his ability to defend against the charges or affected the outcome of the trial. We are convinced beyond a reasonable doubt that any error was harmless and defendant is not entitled to reversal.

## II. RESPONSE TO JURY QUESTION OR REQUEST NO. 7

Defendant challenges the court's response to Jury Question or Request No. 7. Because defense counsel agreed to the court's response and thereby forfeited this argument (*People v. Dykes* (2009) 46 Cal.4th 731, 802), defendant alleges ineffective assistance of counsel. We conclude defendant was not prejudiced by the court's response, and we therefore reject his claim of ineffective assistance of counsel.

### A. Additional Factual Background

As explained above, Jury Question or Request No. 7 stated:

"Can you please clarify count 14 as it relates to date.

"~~When it states 'on or about April 8th'~~

"Can we vote ~~giulty~~ guilty on count 14 if we conclude that a forcible lewd act occurred at any time before she turned 14?" (Stricken text in original.)

The court discussed the question with counsel, who agreed that the question should be answered affirmatively. Defense counsel specifically stated, "If it's 'on or about,' then I believe we don't have a choice on that one." The court then informed the jury that the answer to their question was, "Yes."

The jury found defendant guilty on count 14, and corrected the jury form by interlineation to reflect the offense occurred "on or about April 8, 2013," rather than "on or about April 8, 2012." The jury also found defendant guilty of continuous sexual abuse of B.M. as alleged in count 13 on or between August 7, 2005, and April 6, 2012.

### B. Applicable Law

Defendant bears the burden of demonstrating ineffective assistance of counsel. (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) " '[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' " (*People v. Woodruff* (2018) 5

23.

Cal.5th 697, 736.)  We "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

We independently determine whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled."  (*People v. Tate* (2010) 49 Cal.4th 635, 696; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 & fn. 4; *Boyde v. California* (1990) 494 U.S. 370, 380.)  We also consider the arguments of counsel in assessing the probable impact of the instruction or instructions on the jury.  (*People v. Young* (2005) 34 Cal.4th 1149, 1202; see *Weeks v. Angelone* (2000) 528 U.S. 225, 236.)  " 'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.'  [Citation.]  When a defendant claims an instruction was subject to erroneous interpretation by the jury, he must demonstrate a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted.  [Citation.]  In determining the correctness of jury instructions, we consider the entire charge of the court, in light of the trial record."  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 926.)

C.     **Analysis**

Defendant contends the court's response to Jury Question or Request No. 7 was incorrect and misleading.  We conclude there is no reasonable likelihood the jury was misled in the way defendant contends or that the outcome would have been different had defense counsel objected.

Defendant first suggests the court's response to Jury Question or Request No. 7 improperly allowed the jury to find him guilty on count 14 based on an offense that occurred during the period covered by the charge of continuous sexual abuse alleged in count 13.  A defendant may not be convicted of both continuous sexual abuse (§ 288.5, subd. (a)), and a specific sexual offense committed within the same period.  (*People v.*

*Johnson* (2002) 28 Cal.4th 240, 248; § 288.5, subd. (c).) Here, defendant was charged in count 13 with continuous sexual abuse of B.M. on or between August 7, 2005, and April 6, 2012, and in count 14 with having committed a forcible lewd act upon B.M. on or about April 8, 2012.

However, in response Jury Question or Request No. 7, the court informed the jury they could find defendant guilty on count 14 based on an act that occurred "any time before [B.M.] turned 14."[13] In the abstract, the jury could have relied on this response to find defendant guilty of both continuous sexual abuse and a forcible lewd act committed within the same period. However, we do not consider the court's instructions in the abstract, but rather in light of the entire trial record. (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 926.) In this regard, we note that the jury altered the verdict form for count 14 to reflect its finding the offense occurred "on or about April 8, 2013."[14] It is therefore apparent the jury found defendant guilty on count 14 based on an act occurring outside the period alleged in count 13.

Defendant next suggests that, as a result of the court's response to Jury Question or Request No. 7, the jurors may not have been unanimous as to the precise forcible lewd act defendant was guilty of on count 14. "[T]o find a defendant guilty of a particular crime, the jurors must unanimously agree that the defendant committed the same specific act constituting the crime within the period alleged." (*People v. Crow* (1994) 28 Cal.App.4th 440, 445; see Cal. Const., art. I, § 16.) "When an accusatory pleading charges the defendant with a single criminal act, and the evidence presented at trial tends to show more than one such unlawful act, either the prosecution must elect the specific

---

[13] B.M. was born in August 1999, and therefore turned 14 years old in August 2013.

[14] Defendant speculates that some members of the jury may have determined the act occurred earlier, despite this express finding. The verdict form clearly stated the jury's finding and, when polled, the jurors each confirmed it represented their verdict. Defendant's speculation is unfounded.

act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act. [Citation.]  The duty to instruct on unanimity when no election has been made rests upon the court sua sponte." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)  "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

Here, the prosecutor expressly elected to rely on defendant's Easter assault on B.M. to support count 14:  "And then Count Fourteen, just like [S.M.], we do have one specific act that you will all need to be unanimous on whether that occurred.  That's the Easter assault where, you know, [B.M.] did testify that the defendant penetrated her."  Accordingly, the court was not required to instruct the jury on the unanimity requirement.  However, defendant contends Jury Question or Request No. 7 suggested the jury may have considered whether other lewd acts could support a guilty verdict.  We disagree.

Jury Question or Request No. 7 asked, "Can you please clarify count 14 *as it relates to date.*"  (Italics added.)  The jury then asked if it could find defendant guilty "if we conclude that a forcible lewd act occurred at any time before she turned 14?"  Although the jury made a general reference to "a forcible lewd act," rather than a specific reference to the Easter assault, the jury did not ask whether they could find defendant guilty on count 14 based on a different act.  It is plain from Jury Question or Request Nos. 4 and 7 that the jury struggled to reconcile the allegation that the act supporting count 14 occurred in April 2012, with B.M.'s testimony that the act occurred on Easter in Merced, and other testimony suggesting that the family did not move to Merced until 2013.  The record does not suggest the jury was permitted to consider, or did consider, whether any other acts supported count 14.  To the contrary, the jury's finding that the

offense occurred on or about April 8, 2013, suggests the jury remained focused on the Easter assault.[15]

Based on the foregoing, we conclude the jury was not misled by the court's response to Jury Question or Request No. 7 and there is no reasonable probability that an objection by counsel would have resulted in a more favorable outcome for defendant. Defendant has not established ineffective assistance of counsel.

## III. FINES, FEES, AND ASSESSMENTS

Defendant contends the fines, fees, and assessments imposed by the trial court violate his rights to due process and freedom from excessive fines under the Eighth and Fourteenth Amendments to the United States Constitution and analogous provisions of the California Constitution because he is unable to pay. He asks that the matter be remanded for a hearing to determine his ability to pay. Although defendant did not object to the fines, fees, and assessments in the trial court, he nonetheless presents various arguments for why we should resolve his claims on the merits. To the extent his arguments are forfeited, defendant alleges ineffective assistance of counsel.

### A. Applicable Law

*People v. Dueñas* (2019) 30 Cal.App.5th 1157 held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes fines or fees. (*Id.* at p. 1164; see *id.* at p. 1167.)

### B. Analysis

Here, the trial court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)); a $10,000 parole revocation fine, stayed pending successful completion of parole

---

**15**      Nothing in the evidence established the date Easter fell on in either 2012 or 2013. While the prosecution was not required to prove the offense was committed on that precise date (§ 955; *People v. Richardson* (2008) 43 Cal.4th 959, 1027; *People v. Jennings* (1991) 53 Cal.3d 334, 358-359), the jury was not instructed in that regard. The lack of such instruction may have contributed to the jury's continuing confusion regarding whether it could find defendant guilty based on a different date.

(§ 1202.45); a $420 criminal conviction assessment (Gov. Code, § 70373); a $560 court operations assessment (§ 1465.8); and $22,785.55 in direct victim restitution.

As an initial matter, we reject defendant's *Dueñas*-based challenge to victim restitution. *Dueñas* addressed revenue-generating assessments and a punitive restitution fine, whereas direct victim restitution is intended to make the victim whole. "Based on the significant differences in purpose and effect between victim restitution and the moneys at issue in *Dueñas*," the holding in *Dueñas* does not extend to direct victim restitution. (*People v. Evans* (2019) 39 Cal.App.5th 771, 777.)

We also reject defendant's *Dueñas*-based challenge to the restitution fine. This challenge is forfeited because the court ordered defendant to pay the maximum restitution fine of $10,000. (§ 1202.4, subd. (b)(1).) When the court imposes a restitution fine greater than the $300 statutory minimum, "[s]ection 1202.4 expressly contemplates an objection based on inability to pay."[16] (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*); accord, *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073 (*Aviles*); § 1202.4, subds. (c)-(d).) While *Dueñas* had not been decided at the time of defendant's sentencing hearing, defendant had the statutory right to object to the $10,000 restitution fine and to demonstrate his inability to pay, and such an objection "would not have been futile under governing law at the time of his sentencing hearing." (*Frandsen*, at p. 1154; accord, *Aviles*, at pp. 1073-1074; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 ["[E]ven before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute [citation] expressly permitted such a challenge."].) Defendant's failure to object in the trial court forfeits his challenge to this fine.

---

**16** Additionally, our Supreme Court recently held that a trial court "must consider" a defendant's ability to pay when it imposes a restitution fine in excess of the statutory minimum, and is presumed to have done so absent evidence to the contrary. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1041.)

The remaining assessments are mandatory and defendant lacked the statutory right to object based on ability to pay. Nonetheless, he forfeited the right to object to these assessments as a practical matter. Having chosen not to object to the $10,000 restitution fine, "he surely would not complain on similar grounds" regarding less than $1,000 in additional assessments. (*People v. Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033.) Furthermore, although these assessments were mandatory, nothing in the record of the sentencing hearing indicates that defendant was foreclosed from challenging these assessments in the trial court in the first instance. (*Aviles*, *supra*, 39 Cal.App.5th at p. 1074; *Frandsen*, *supra*, 33 Cal.App.5th at p. 1154.) "[Defendant] plainly could have made a record had his ability to pay actually been an issue. Indeed, [he] was obligated to create a record showing his inability to pay the maximum restitution fine, which would have served to also address his ability to pay the assessments." (*Frandsen*, at p. 1154; accord, *Aviles*, at p. 1074.)

Defendant asserts that, if we find forfeiture, his trial counsel was ineffective for failing to object to the imposition of fines and fees based on an inability to pay. As stated above, defendant bears the burden of demonstrating ineffective assistance of counsel. (*People v. Mickel*, *supra*, 2 Cal.5th at p. 198.) "Rarely is ineffective assistance of counsel established on appeal since the record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff*, *supra*, 5 Cal.5th at p. 736.) In determining whether counsel's performance was deficient, we consider whether " ' " 'counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) Reversal is permitted " 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

We cannot say trial counsel had no conceivable tactical purpose for not requesting an ability to pay hearing. The probation officer's report reflects defendant was 54 years old at the time of sentencing and had extensive employment history, including as a machinist, the owner of his own landscaping business, and, for the four years immediately preceding his arrest, as a minister. Nothing in the record suggests defendant would be unable to pay the fines and fees imposed.[17] It is therefore conceivable counsel concluded defendant would have been able to pay his fines and fees over time. (See *Aviles*, *supra*, 39 Cal.App.5th at pp. 1075-1077.) The record does not affirmatively exclude a rational basis for trial counsel's choice. Defendant has failed to establish ineffective assistance of counsel.

Even if defendant did not forfeit the issue, any error under *Dueñas* is necessarily harmless since defendant has the ability to make payment on the fines, fees, and assessments over the course of his long prison sentence. (*Aviles*, *supra*, 39 Cal.App.5th at pp. 1075-1077.) "While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from either prison wages or monetary gifts from family and friends during his lengthy prison sentence." (*Id.* at p. 1077.)

Finally, defendant contends the imposition of fines, fees, and assessments without consideration of ability to pay violates the Eighth Amendment's prohibition against

---

**17**    Defendant points out that he was represented by retained counsel throughout trial, but that retained counsel was relieved when defendant was unable to pay expenses related to bringing a motion for new trial. At that time, retained counsel represented that defendant's family did not have funds to direct toward a potentially unsuccessful motion for new trial. However, should the motion for new trial prove successful, the family intended to "put whatever funds they may have now," as well as additional funds they may "come up with" toward the new trial, including possibly rehiring trial counsel. Ultimately, defendant was represented by appointed counsel for the remainder of the trial court proceedings and on appeal. As we explain, we do not find this factor dispositive of defendant's ability to pay fines, fees, and assessments over time. (See *Aviles*, *supra*, 39 Cal.App.5th at pp. 1075-1077.)

excessive fines. He has failed to make a developed argument on this point that is distinct from his due process argument. We decline to address this undeveloped claim. (See *Maral v. City of Live Oak* (2013) 221 Cal.App.4th 975, 984-985; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)

## IV. CORRECTIONS TO ABSTRACT OF JUDGMENT

Defendant requests certain corrections to the abstract of judgment, which the People concede are necessary.

The abstract of judgment states that counts 11 through 14 were committed in 2016. However, count 11 was alleged to have occurred between November 13, 2006, and November 12, 2010. Count 12 was alleged to have occurred on or about February 14, 2015. Count 13 was alleged to have occurred between August 7, 2005, and April 6, 2012. Count 14 was alleged to have occurred on or about April 8, 2012, but was amended by the jury in the verdict form to reflect the offense took place on or about April 8, 2013. The abstract of judgment must be corrected to address these errors.

Additionally, there is an error in the abstract of judgment detailing defendant's determinate sentence. The first page of the form abstract of judgment correctly lists a series of determinate sentences totaling 20 years. An additional attachment page correctly lists a series of determinate sentences totaling nine years. However, item 8 on the first page of the form abstract of judgment states that defendant's "TOTAL TIME" is 20 years, 4 months. Defendant and the People agree that item 8 is incorrect. They contend the "TOTAL TIME" listed in item 8 should reflect the total time listed on the first page of the form abstract of judgment, i.e., 20 years, 0 months. We agree that the time calculation of 20 years, 4 months listed in item 8 is incorrect. However, item 8 should list defendant's "TOTAL TIME," not solely the total time included on the first page of the abstract of judgment. Accordingly, item 8 of the abstract of judgment for defendant's determinate sentence must be corrected to reflect defendant's total determinate sentence of 29 years.

**DISPOSITION**

The matter is remanded for the trial court to correct the abstract of judgment as directed herein. The court shall forward a copy of the corrected abstract of judgment to the appropriate authorities. In all other respects, the judgment is affirmed.


DETJEN, J.

WE CONCUR:


HILL, P.J.


PEÑA, J.

32.